Case 1:23-cr-20264-DPG   Document 1   Entered on FLSD Docket...

FILED BY  mdc  D.C.
Jun 22, 2023
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami, FL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**23-20264-CR-GAYLES/TORRES**

Case No. _____

18 U.S.C. § 371
18 U.S.C. § 982(a)(7)

UNITED STATES OF AMERICA

vs.

**ARMANDO HERRERA,**

        **Defendant.**

_____/

## INFORMATION

The United States Attorney charges that:

### GENERAL ALLEGATIONS

At all times material to this Information:

1. The U.S. Food and Drug Administration ("FDA") was the federal agency responsible for protecting the health and safety of the American public by, among other things, regulating the distribution and sale of drugs, including prescription drugs, and enforcing the Food, Drug, and Cosmetic Act ("FDCA"), Title 21, United States Code, Sections 301 et seq. One purpose of the FDCA was to ensure that drugs sold for use by humans were safe, effective, and bore labeling containing only true and accurate information.

2. Federal law, including Title 21, United States Code, Section 360eee-1, generally required that prescription drugs sold in the United States be accompanied by product tracing information, which consisted of transaction information, transaction history, and a transaction statement. The product tracing information identified, among other things, the product, the quantity,

the lot number, strength and dosage, the date of each sale, and the parties to each transaction. Such product tracing information was commonly referred to in the industry as "T3s" or "pedigrees."

3. Under the FDCA, "drugs" were defined as, among other things, articles intended for use in the cure, mitigation, treatment, or prevention of disease, pursuant to Title 21, United States Code, Section 321(g)(1)(B). A "prescription drug" was any drug intended for use in humans that, because of its toxicity or potential for harmful effect, the method of its use, or the collateral measures necessary for its use, was not safe for use except under the supervision of a practitioner licensed by law to administer such drug, or was limited by an approved application under Title 21, United States Code, Section 355 to use under the professional supervision of a practitioner licensed by law to administer such drug, pursuant to Title 21, United States Code, Section 353(b)(1).

4. The introduction or delivery for introduction, or the causing thereof, into interstate commerce of any drug that was adulterated or misbranded was a violation of federal law, pursuant to Title 21, United States Code, Section 331(a).

5. A drug was adulterated if, among other things, any substance had been substituted in whole or in part for the drug, pursuant to Title 21, United States Code, Section 351(d).

6. A drug was misbranded if, among other things, its labeling was false or misleading in any particular, pursuant to Title 21, United States Code, Section 352(a)(1). A "label" was written, printed, or graphic matter upon the immediate container of the drug, while "labeling" was a broader term that included all labels and other written, printed, or graphic matter upon the drug or any of its containers or wrappers, or that accompanied the drug, pursuant to Title 21, United States Code, Section 321(k) and (m).

**Prescription Drug Diversion**

7. The term "prescription drug diversion" referred to the various ways in which

prescription drugs were removed from regulated distribution channels and subsequently reintroduced into the wholesale marketplace. Common methods of prescription drug diversion included, but were not limited to, acquiring prescription drugs illegally through fraud or from individual patients for whom the prescription drugs had been prescribed and dispensed but intentionally not consumed ("diverted drugs"). These diverted drugs, which in some instances contained the incorrect medication, were then reintroduced into the wholesale marketplace with false documentation concealing their true source and eventually resold to individual consumers by pharmacies. These pharmacies subsequently billed the drugs to "health care benefit programs," as defined by Title 18, United States Code, Section 24(b). Once diverted from the regulated distribution channel, it became difficult for regulators and consumers to know whether a diverted drug was altered, stored in improper conditions, had its potency adversely affected, or was otherwise harmful.

### The Defendant and Related Entities

8.      Rapid's Tex Whole Sales Corp ("Rapid's Tex") was a corporation organized under the laws of the State of Texas and a licensed distributor of pharmaceutical drugs. Rapid's Tex purported to sell legitimate prescription drugs, including expensive human immunodeficiency virus ("HIV") medication, to wholesale distributors of pharmaceutical products.

9.      MR UNLIMITED, LLC ("MR UNLIMITED") was a limited liability company organized under the laws of the State of Texas and a licensed distributor of pharmaceutical drugs. MR UNLIMITED purported to sell legitimate prescription drugs, including expensive HIV medication, on behalf of Rapid's Tex to wholesale distributors of pharmaceutical products.

10.     Invicta Wholesale Supply, LLC ("Invicta") was a limited liability company organized under the laws of the State of Washington and a licensed distributor of pharmaceutical

3

drugs. Invicta purported to sell legitimate prescription drugs, including expensive HIV medication, to wholesale distributors of pharmaceutical products.

11. Omom Pharmaceuticals, Inc. ("Omom Pharmaceuticals") was a corporation organized under the laws of the State of California and a licensed distributor of pharmaceutical drugs. Omom Pharmaceuticals purported to sell legitimate prescription drugs, including expensive HIV medication, to wholesale distributors of pharmaceutical products.

12. Titan Distribution & Services LLC ("Titan Distribution & Services") was a limited liability company organized under the laws of the State of Florida.

13. Wholesale Company 1, a company organized under the laws of the State of Delaware with a principal place of business in Maryland, was a licensed distributor of pharmaceutical products, including prescription drugs.

14. Wholesale Company 2 was a company organized under the laws of the State of Colorado and a licensed distributor of pharmaceutical products, including prescription drugs.

15. Defendant **ARMANDO HERRERA** was a resident of Miami-Dade County, Florida.

### Conspiracy to Introduce Adulterated and Misbranded Drugs Into Interstate Commerce
### (18 U.S.C. § 371)

1. The General Allegations section of this Information is re-alleged and incorporated by reference as though fully set forth herein.

2. From in or around January 2019, and continuing through in or around at least November 2021, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**ARMANDO HERRERA,**

did knowingly and willfully, that is, with the intent to further the object of the conspiracy, combine, conspire, confederate, and agree with others, known and unknown to the United States Attorney, to commit an offense against the United States, that is, with the intent to defraud and mislead, to introduce and deliver for introduction into interstate commerce, and cause to be introduced and delivered for introduction into interstate commerce, adulterated and misbranded drugs, in violation of Title 21, United States Code, Sections 331(a) and 333(a)(2).

## Purpose of the Conspiracy

3. It was a purpose of the conspiracy for defendant **ARMANDO HERRERA** and his co-conspirators to unlawfully enrich themselves by selling and distributing diverted drugs that were adulterated and misbranded as if they had been acquired through the legitimate channels of distribution in the pharmaceutical market.

## Manner and Means of the Conspiracy

The manner and means by which defendant **ARMANDO HERRERA** and his co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things, the following:

4. **ARMANDO HERRERA** and his co-conspirators established Rapid's Tex, MR UNLIMITED, Invicta, and Omom Pharmaceuticals in Texas, Washington, and California, and obtained wholesale drug distributor licenses for these companies.

5. **ARMANDO HERRERA** and his co-conspirators acquired large quantities of diverted drugs, including HIV medications.

6. **ARMANDO HERRERA** and his co-conspirators repackaged these diverted drugs and falsified their packaging, T3s/pedigrees, and other labeling to make it appear as though the

diverted prescription drugs had been properly acquired through legitimate and regulated channels of distribution ("adulterated and misbranded diverted drugs").

7. **ARMANDO HERRERA** and his co-conspirators introduced these adulterated and misbranded diverted drugs into interstate commerce by selling and distributing them to co-conspirators at Wholesale Company 1 and Wholesale Company 2 at steep discounts, far below the prices available when the prescription drugs were sold through legitimate channels of distribution.

8. **ARMANDO HERRERA** and his co-conspirators received more than approximately $16.7 million from co-conspirators at Wholesale Company 1 and Wholesale Company 2 in exchange for these adulterated and misbranded diverted drugs.

9. **ARMANDO HERRERA** and his co-conspirators established Titan Distribution & Services in Florida and transferred a portion of the proceeds from the sales of these adulterated and misbranded diverted drugs to a bank account in the name of Titan Distribution & Services.

10. Co-conspirators at Wholesale Company 1 and Wholesale Company 2 resold and shipped these adulterated and misbranded diverted drugs, along with their falsified labeling and documentation, to pharmacies located throughout the United States, which billed health care benefit programs thousands of dollars for each 30-day supply of these drugs, and further dispensed the adulterated and misbranded diverted drugs to unsuspecting consumers.

11. **ARMANDO HERRERA** and his co-conspirators used the proceeds of the fraud for their own benefit, the benefit of others, and to further the fraud.

### Overt Acts

In furtherance of the conspiracy, and to achieve its object, at least one member of the conspiracy committed and caused to be committed, in the Southern District of Florida, and elsewhere, at least one of the following overt acts:

1.  On or about August 31, 2020, **ARMANDO HERRERA** and his co-conspirators filed documents with the Florida Secretary of State to form Titan Distribution & Services.

2.  On or about March 4, 2021, **ARMANDO HERRERA** and his co-conspirators, through Rapid's Tex and MR UNLIMITED, sent a shipment of adulterated and misbranded diverted drugs to co-conspirators at Wholesale Company 1.

3.  On or about March 11, 2021, co-conspirators at Wholesale Company 1 sent a payment of approximately $800,033 to MR UNLIMITED for these adulterated and misbranded diverted drugs.

4.  On or about May 20, 2021, **ARMANDO HERRERA** and his co-conspirators, through Omom Pharmaceuticals, sent a shipment of adulterated and misbranded diverted drugs to co-conspirators at Wholesale Company 2.

5.  On or about May 21, 2021, **ARMANDO HERRERA** and his co-conspirators, through Invicta, sent a shipment of adulterated and misbranded diverted drugs to co-conspirators at Wholesale Company 2.

6.  On or about July 1, 2021, co-conspirators at Wholesale Company 1 sent a payment of approximately $489,201 to Omom Pharmaceuticals for adulterated and misbranded diverted drugs.

7.  On or about July 2, 2021, co-conspirators at Wholesale Company 2 sent a payment of approximately $1,098,337 to Invicta for adulterated and misbranded diverted drugs.

8.  On or about July 7, 2021, co-conspirators at Wholesale Company 1 sent a payment of approximately $527,277 to Omom Pharmaceuticals for adulterated and misbranded diverted drugs.

9. On or about July 8, 2021, **ARMANDO HERRERA** and his co-conspirators received and deposited a check totaling approximately $324,200 issued by Omom Pharmaceuticals to Titan Distribution and Services.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE
## (18 U.S.C. § 982(a)(7))

1. The allegations in this Information are hereby re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendant, **ARMANDO HERRERA**, has an interest.

2. Upon conviction of conspiracy to violate Title 21, United States Code, Section 331, as alleged in this Information, the defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 982(a)(7).

3. The property subject to forfeiture as a result of the alleged offense, includes, but is not limited to, the following:

    a. The sum of at least approximately $16,700,000 in United States currency, which amount is equal to the gross proceeds traceable to the commission of the violations alleged in this Information and which the United States may seek as a forfeiture money judgment;
    b. 16,050 tablets of adulterated and misbranded HIV medication Truvada;
    c. 3,690 tablets of adulterated and misbranded HIV medication Biktarvy; and
    d. 7,341 tablets of other adulterated and misbranded diverted drugs.

4. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;
    b. has been transferred or sold to, or deposited with, a third party;
    c. has been placed beyond the jurisdiction of the court;
    d. has been substantially diminished in value; or
    e. has been commingled with other property which cannot be divided without

difficulty, the United States shall be entitled to the forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Section 982(a)(7), Title 28, United States Code, Section 2461(c), and the procedures set forth in Title 21, United States Code, Section 853, as incorporated by Title 18, United States Code, Section 982(b)(1).

_____
MARKENZY LAPOINTE
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA


GLENN S. LEON, CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

_____
ALEXANDER THOR POGOZELSKI
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

CASE NO.: _____

v.

ARMANDO HERRERA,

_____/
                Defendant.

**CERTIFICATE OF TRIAL ATTORNEY**

**Superseding Case Information:**
New Defendant(s) (Yes or No) _____
Number of New Defendants _____
Total number of counts _____

**Court Division** (select one)
☒ Miami     ☐ Key West     ☐ FTP
☐ FTL       ☐ WPB

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. §3161.

3. Interpreter: (Yes or No) No
   List language and/or dialect: _____

4. This case will take __0__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)                (Check only one)
   I    ☒ 0 to 5 days              ☐ Petty
   II   ☐ 6 to 10 days             ☐ Minor
   III  ☐ 11 to 20 days            ☐ Misdemeanor
   IV   ☐ 21 to 60 days            ☒ Felony
   V    ☐ 61 days and over

6. Has this case been previously filed in this District Court? (Yes or No) No
   If yes, Judge _____ Case No. _____

7. Has a complaint been filed in this matter? (Yes or No) No
   If yes, Magistrate Case No. _____

8. Does this case relate to a previously filed matter in this District Court? (Yes or No) No
   If yes, Judge _____ Case No. _____

9. Defendant(s) in federal custody as of _____

10. Defendant(s) in state custody as of _____

11. Rule 20 from the _____ District of _____

12. Is this a potential death penalty case? (Yes or No) No

13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) No

14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss? (Yes or No) No

15. Did this matter involve the participation of or consultation with now Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No

By: _____
ALEXANDER THOR POGOZELSKI
DOJ Trial Attorney
Court ID No.    A5502549

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:** _____**ARMANDO HERRERA**_____

**Case No:** _____

Count #:   1

   Title 18, United States Code, Section 371   

   Conspiracy to Introduce Adulterated and Misbranded Drugs Into Interstate Commerce
\* Max. Term of Imprisonment:    5 years
\* Mandatory Min. Term of Imprisonment (if applicable):    N/A
\* Max. Supervised Release:    3 years
\* Max. Fine:    $250,000 or twice the gross gain or loss resulting from the offense

\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.